[No. 47784-6-I.   Division One.   February 4, 2002.]

TEX ENTERPRISES, INC., *Appellant*, v. BROCKWAY STANDARD, INC., ET AL., *Respondents*.

*David S. Grossman* and *Kimberly O. Grieco* (of *Lesourd & Patten, P.S.*), for appellant.

*John P. Hayes* and *Michael P. Hooks* (of *Frosberg & Umlauf, P.S.*), for respondents.

BAKER, J. — Tex Enterprises, Inc., (Tex) entered into a contract with J.F. Shelton Company (Shelton), a distributor, to purchase three and five gallon containers for shipping and storing the deck coating it produces. Tex claims that it was induced into purchasing the containers by in-person representations from the Georgia manufacturer, Brockway Standard, Inc. (Brockway). Tex brought breach of

warranty claims against Brockway when the containers malfunctioned. The trial court dismissed Tex's warranty claims against Brockway based upon disclaimers and choice of law provisions printed on the reverse side of invoices from Brockway to the distributor from whom Tex purchased the containers. Tex appeals the dismissal of the express and implied warranty claims as well as the refusal to allow it to add a claim of estoppel to the complaint.

We hold that a manufacturer's direct representations to the purchaser can create express and implied warranties that run to the purchaser independent of any contract between the manufacturer and distributor, and we reverse.

## I

Tex, a Washington Corporation based in Auburn, manufactures deck coating under the brand name Spantex. It packages the coating in one, three and five gallon containers. Tex historically purchased its three and five gallon containers from a different manufacturer, Norton, but Tex purchased its one gallon containers from Shelton,[1] a Washington distributor. The defendant Brockway, headquartered in Georgia, manufactured the one gallon containers.

Tex alleges that in 1997, a representative from Shelton arranged a meeting with Tex's president, Charles Pieratt, and Brockway's representative, Tod Egan, to convince Tex to switch to Brockway's three and five gallon containers. In that meeting, Brockway's representative stated to Pieratt that the Brockway containers were "just as good as the Norton [containers]." He represented that the Brockway containers would be equally as effective for storing and shipping the deck coating material. Brockway offered Shelton a chargeback (similar to a rebate) if Tex purchased these containers through Shelton.

Following the meeting, Tex ordered and purchased thousands of the three and five gallon Brockway containers from

---

[1] Shelton has settled with Tex and is not involved in this appeal.

Shelton, and used them to ship more than 22,000 gallons of deck coating. Thereafter, Tex began receiving complaints from its customers that the coating was congealing in the containers. As a result, Tex replaced more than one-half of the coating shipped in the Brockway containers.

When Brockway shipped its containers to Shelton, it set forth terms and conditions of the sale on the reverse side of invoices sent to Shelton. These terms included a choice of law provision selecting Georgia law, a warranty disclaimer, and a damage limitation clause. None of these terms appeared on the containers, nor were any of the terms communicated in any way to Tex.

In its various orders, the trial court ruled that the choice of law provision was binding on Tex, and applied Georgia law. The court dismissed various claims brought by Tex including a claim for breach of implied warranty and limited damages recoverable for breach of express warranty. Later, the court dismissed the breach of express warranty claim entirely. Dismissal of both warranty claims was based upon lack of privity. The court also denied Tex's motion to add a claim for promissory estoppel. Tex appeals.

## II

■ We first examine whether the trial court correctly applied the law of Georgia in dismissing Tex's claims. If Tex's claims against the manufacturer are strictly derivative of the contractual relationship existing between the manufacturer and the distributor, Shelton, then arguably Tex is bound by the choice of law provision found on the invoices sent to Shelton by the manufacturer. But we need not decide this question because we conclude that Tex's claims are not strictly derivative. The claims are not based solely on the existence of a contract between Brockway and Shelton, but upon the central role Brockway assumed in persuading Tex to purchase its product. Brockway's representative came to Washington for that purpose, and met personally with Tex's president. It was during that meeting

that express and implied verbal warranties were made by Brockway, and it was as a direct result of that meeting that the allegedly defective containers were purchased. Tex is seeking to recover damages for a breach of those same express and implied warranties. Under these circumstances, we conclude that the terms and conditions applicable to the contractual relationship between Brockway and Shelton are not applicable to Tex's claim against Brockway.

The question remains whether, under the law of Washington, Tex may pursue its claims directly against the manufacturer, Brockway.

■ This case presents a question of vertical privity as opposed to horizontal privity. Vertical privity refers to privity of contract between parties connected in the chain of distribution, for example an end user who purchases a product from a retailer may be deemed to be in vertical privity with the manufacturer.[2] Horizontal privity describes the relationship of a nonbuyer consumer or user to a product seller or manufacturer. For example, a member of a buyer's household injured by a product may be in horizontal privity with the manufacturer.[3] Washington courts historically required privity of contract between the parties in actions founded upon warranty.[4] More recently, however, the strict privity requirement has been relaxed in favor of the sum of the circumstances test,[5] at least in cases dealing with vertical privity. The sum of the circumstances test is applied to determine whether an ultimate purchaser is an

---

[2] *Touchet Valley Grain Growers, Inc. v. Opp & Seibold Gen. Constr., Inc.*, 119 Wn.2d 334, 344, 831 P.2d 724 (1992).

[3] *Touchet Valley*, 119 Wn.2d at 344-45.

[4] *Daughtry v. Jet Aeration Co.*, 91 Wn.2d 704, 711, 592 P.2d 631 (1979).

[5] The test considers whether the manufacturer knew the ultimate purchaser's identity, knew of the purpose of the product, whether the product was manufactured to the purchaser's specifications, and whether the manufacturer delivered the product directly to the end user. *Touchet Valley*, 119 Wn.2d at 345 (citing with approval *Kadiak Fisheries Co. v. Murphy Diesel Co.*, 70 Wn.2d 153, 422 P.2d 496 (1967)).

intended beneficiary of warranties made by a party further up the distribution chain.[6]

■ Both parties extensively cite to and rely on *Touchet Valley Grain Growers, Inc. v. Opp & Seibold General Construction, Inc.*[7] to support their respective positions on the issue of privity. But *Touchet* is inapplicable because the sum of the circumstances test discussed in that case deals with whether express and implied warranties between the manufacturer and intermediary run to the benefit of the purchaser. In contrast, Brockway disclaimed all such warranties to Shelton. Thus a third party beneficiary analysis cannot apply here. Instead, we conclude that a manufacturer's representations and conduct can create express and implied warranties which run directly to the purchaser independent of any contract between the manufacturer and intermediary.

Although not directly on point, *Dobias v. Western Farmers Ass'n*[8] provides support for this conclusion. In that case, the manufacturer of a weed-killer herbicide made representations to the retailer that its product was compatible for use with corn.[9] As a result, Dobias, a corn farmer, purchased the herbicide from the retailer and used it on corn crops. Located on the product itself and visible to Dobias were labels disclaiming both express and implied warranties.[10] Following application of the herbicide, the corn plants were visibly stunted and became infested with a parasitic disease.[11] The court in *Dobias* held that despite the disclaimer, the manufacturer was liable for breach of express and implied warranties to the end user because of the reliance on the manufacturer's representations to the

---

[6] *Touchet Valley*, 119 Wn.2d at 346-47.

[7] 119 Wn.2d 334, 831 P.2d 724 (1992).

[8] 6 Wn. App. 194, 491 P.2d 1346 (1971).

[9] *Dobias*, 6 Wn. App. at 195-96.

[10] *Dobias*, 6 Wn. App. at 199.

[11] *Dobias*, 6 Wn. App. at 196.

retailer.[12] Here, unlike the end user in *Dobias*, Tex had no knowledge of any disclaimers. Further, Brockway's representations were made directly to Tex.

In *Cedars of Lebanon Hospital Corp. v. European X-Ray Distributors of America, Inc.*,[13] the plaintiff alleged that sales representatives from the manufacturer called upon it and made direct representations concerning the quality of its x-ray equipment.[14] It alleged that it relied on these representations and inducements when it decided to purchase two remote x-ray systems from the distributor.[15] When the x-ray equipment failed, Cedars brought an action for breach of express and implied warranties. The manufacturer defended on the basis that there was no privity between the parties.[16] The court determined that the manufacturer's representations and conduct regarding its product created express and implied warranties that ran to the purchaser independent of the contract between the manufacturer and distributor. The court explained in a footnote that if there had been no direct contact between the manufacturer and end user, a finding of no privity and thus no liability would have been appropriate.[17]

We adopt the court's reasoning in *Cedars of Lebanon Hospital* and conclude that the direct contact and representations between Brockway and Tex created express and implied warranties independent of Shelton's contract with Brockway. A contrary ruling would allow the manufacturer to hide behind the doctrine of privity when the product, which it directly induced the purchaser to buy, does not perform as promised.

██ Tex argues that the trial court erred in denying its motion to add a claim of estoppel. The trial court's denial of

---

[12] *Dobias*, 6 Wn. App. at 199.

[13] 444 So. 2d 1068 (Fla. Dist. Ct. App. 1984).

[14] *Cedars of Lebanon Hosp.*, 444 So. 2d at 1072.

[15] *Cedars of Lebanon Hosp.*, 444 So. 2d at 1072.

[16] *Cedars of Lebanon Hosp.*, 444 So. 2d at 1069.

[17] *Cedars of Lebanon Hosp.*, 444 So. 2d at 1072 n.4.

a motion to amend a complaint is reviewed under an abuse of discretion standard.[18] The trial court's decision will be reversed only when it is " 'manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons.' "[19]

The trial court denied Tex's motion to amend in part because it was untimely. Tex initially filed an eight-count amended complaint in May 1999. Discovery closed on July 12, 2000, but Tex did not move to add a claim for equitable estoppel until July 20, 2000, less than two weeks before trial.

█ Undue delay is a proper ground for denial of a motion for leave to amend.[20] Accordingly, the trial court properly denied the motion to amend.

Reversed and remanded.

AGID, C.J., and APPELWICK, J., concur.

Reconsideration denied March 15, 2002.

Review granted at 147 Wn.2d 1014 (2002).

---

[18] *Culpepper v. Snohomish County Dep't of Planning & Cmty. Dev.*, 59 Wn. App. 166, 169, 796 P.2d 1285 (1990).

[19] *Wilson v. Horsley*, 137 Wn.2d 500, 505, 974 P.2d 316 (1999) (quoting *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971)).

[20] *Elliott v. Barnes*, 32 Wn. App. 88, 92, 645 P.2d 1136 (1982).